UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mitchell Schoenberg,                    :    Case No. 1:07-cv-276
                                        :
     Plaintiff,                         :
                                        :
vs.                                     :
                                        :
Fifth Third Bank and Fifth Third        :
Bancorp,                                :
                                        :
     Defendants.                        :

**ORDER**

Before the Court is Defendants' motion for summary judgment.
(Doc. 35) Plaintiff opposes the motion (Doc. 45), and Defendants
have filed a reply.  (Doc. 48)  Defendants terminated Plaintiff's
employment as Director of the IT Audit Department in November
2005.  Plaintiff asserts claims of promissory estoppel, breach of
contract, breach of the covenant of good faith and fair dealing,
and religious and age discrimination, all arising out of his
termination.

For the following reasons, the Court finds Defendants'
motion to be meritorious, and therefore the Court will grant the
motion.

**FACTUAL BACKGROUND**

Plaintiff Mitchell Schoenberg is a certified public
accountant with a Master's degree in accounting.  He also holds
several certifications in auditing, and has experience working

for several large companies in audit and accounting. In the fall of 2004, Schoenberg was living in Taiwan, where he had settled after marrying a Taiwanese native. The company he worked for had closed its East Asia office, and he was looking for a position that would permit him to stay in Asia for family reasons. Schoenberg was negotiating with PriceWaterhouseCoopers for a position in its international audit practice.

Schoenberg was contacted by an external recruiter for Fifth Third, which was searching for a Director of its internal Information Technology Audit group. After discussing the position with the recruiter, Schoenberg agreed to come to Cincinnati for interviews with Fifth Third personnel. He spoke with several individuals during his visit, including Steve Beaton (who had transferred out of the position some months prior), and Dan Poston, Director of Internal Audit and to whom the IT Audit Director reported.

After this visit, Fifth Third offered Schoenberg a position in a written letter. Schoenberg declined this offer, telling the recruiter he had decided to stay in Asia with PWC. According to Schoenberg, the recruiter was surprised and panicked at his response, and renewed her efforts to convince him to join Fifth Third. When Poston heard of Schoenberg's decision, Poston asked Fifth Third's President and CEO George Schaefer to call Schoenberg about the position. During that telephone call,

Schoenberg told Schaefer that he felt the bank's offer to make him a Vice-President was unsatisfactory, especially because his position at PWC was a "fast track" to partnership as an Executive Director. In response, Schaefer increased the Bank's offer to include a position at the Senior Vice President level. Schaefer said that Schoenberg would have to begin as a vice-president, but that Schaefer would nominate Schoenberg at the first available time for a Senior VP title, and that Schaefer would "make sure" that Schoenberg's nomination was successful. Schaefer told Schoenberg that he would not have to wait an extended time to be nominated, that "he would get me into the first round of nominations." Schoenberg admitted that Schaefer did not promise him he would be hired in at the senior level, or that he could skip the nomination process altogether. (Schoenberg Deposition pp. 101-103.)

Schoenberg also spoke with Poston about the officer appointment. Poston told Schoenberg that another employee (Bob Shaffer) was currently a vice president and at the same operational level as the IT Audit Director's position. Elevating Schoenberg to SVP without doing the same for Shaffer could create disparity and imbalance among Poston's direct reports. According to Schoenberg, Poston's proposed resolution was to nominate both of them at the same time. Poston did not tell Schoenberg that his nomination would occur at any specific time.

Fifth Third again offered the job to Schoenberg in a written letter dated November 16, 2004. (Schoenberg Exhibit 4) After further negotiations, Schoenberg accepted the offer on terms set forth in the November 29, 2004 letter, which Schoenberg signed on December 2. (Schoenberg Exhibit 6) This letter states in pertinent part: "Officer appointments are made at the discretion of the President, after a review by the Board of Directors. Such appointments are based upon the stature of the position as well as the job performance and contribution of the individual. It is anticipated, based upon the position and your anticipated performance that an appointment to Senior Vice President will be made in six to nine months." The letter also stated that "As with all positions at Fifth Third, each of us is employed on an at-will basis and no part of this letter should be construed to change that relationship. That is, Fifth Third and each employee can terminate employment at any time."

Schoenberg also signed an addendum to the letter agreement on the same day that addressed the officer appointment issue: "An appointment to Senior Vice President is made by the Board of Directors and your name will be submitted in due course for consideration for appointment. Nominations are periodically submitted by George A. Schaefer, President and CEO to the Board of Directors. However, there is no definite time within which the appointment will occur." (Schoenberg Exhibit 7)

Schoenberg began work at Fifth Third in Cincinnati in mid-December 2004.  Fifth Third witnesses described the IT Audit department as having experienced a period of very fast growth, and the bank faced certain regulatory pressures when Schoenberg started.  The IT Audit position had been vacant for six to nine months, after Beaton had transferred to the information technology department.  Schoenberg supervised approximately 20 employees, and directly reported to Dan Poston.

Poston initially told Schoenberg to take a couple months to develop his relationships with the group and to assess its needs, in order to prepare a new organizational structure.  Schoenberg testified that he believed he met those requests by having regular meetings with the staff of departments he was auditing, and by working with his own staff to build a cohesive team.  He believed that people appreciated his efforts to respond to their concerns and to improve the functioning of the IT audit group.  Schoenberg thought the organizational restructuring project was complicated, and that he and his staff struggled to work through the problems it posed.  Schoenberg testified that he completed a restructuring proposal, although he was not sure if the proposal was in a single written plan.  "We certainly had the components of it.  I don't recall if I packaged them all together. ... [W]e accomplished what was required for the restructuring."  (Schoenberg Deposition pp. 144-145.)  Schoenberg also prepared a

three-year strategic planning outline for his department. (Schoenberg Exhibit 11)

According to Poston, however, Schoenberg was having difficulties establishing himself in his position. Poston received negative reports from the IT Audit managers, largely about Schoenberg's inability to effectively communicate with them, and to focus on the larger strategic decisions, rather than the day-to-day minutiae of departmental operations. Lance Murray, one of Schoenberg's subordinates, described conversations he had with other managers in the group who shared "the same level of frustration, that we were not getting the strategic direction, guidance of where we wanted to continue to take our group." (Murray Deposition pp. 38-39.) Murray perceived Schoenberg as not "fully engaged" in the job, and that he had a dramatically different approach to management than his predecessor, Steve Beaton. Murray spoke to Poston about his concerns with Schoenberg. Marc Wise, another of Schoenberg's direct reports, said that Schoenberg would "get somewhat difficult at times on issues" and would try to "over-manage" him. Wise also testified that when that behavior got more wearing on him, he would report it to Poston. Wise believed the conversations with Poston took place in September to October 2005. (Wise Deposition, pp. 15-18.)

Poston consulted with an HR representative, Lisa Joyner (now Lisa Smith), to prepare for a meeting with Schoenberg in August

2005, to discuss his performance issues.  Joyner recommended several ways to approach Schoenberg, and also that Poston provide a professional job coach to Schoenberg to help him with the areas of concern Poston identified.  (See Joyner-Smith Deposition Exhibit 2.)  The bank often provided coaches to help employees improve performance, and the provision of a coach is not necessarily a reflection of negative job performance.  Poston testified he met with Schoenberg and told him that he had not been promoted to Senior Vice President due to his performance inadequacies, but that Poston and the bank were prepared to work with Schoenberg to help him improve.

Schoenberg denied that Poston gave him any negative feedback about his job performance.  Schoenberg's affidavit states that Poston told him as late as September 2005 that there were no performance problems.  Schoenberg also assumed that the job coach was being provided in response to his own requests to HR for assistance in developing better group relations in his department.

Schoenberg started working with the job coach, Bob Henry, in September 2005.  Henry initially reported to Joyner that Schoenberg seemed open to coaching.  As part of the coaching process, Schoenberg agreed to participate in a "Leadership Practices Inventory," which gathers feedback on specific job parameters from an employee's direct reports, co-workers and

other employees, as well as the participating employee's self-reporting on the same parameters.  The responses are then compiled and compared.  Schoenberg's feedback inventory is dated October 25-27. (Schoenberg Exhibit 13)  Schoenberg chose the employees who would participate in this inventory, sending invitations to all of his direct reports, several of his co-workers, and to Poston.  According to Joyner, Poston did not submit feedback.  The inventory results reflect that Schoenberg's self-reporting scores were generally much higher than the scores reported by his co-workers, with a few exceptions in certain areas.  Henry reported the results to Joyner, telling her in his email that "it's a pity that Mitch's cordiality and openness in my discussions/correspondence with him haven't carried over to his communication with his direct-reports.  I feel terribly that things have deteriorated, and hope we can find ways to salvage the situation."  (Joyner-Smith Deposition Exhibit 4.)

One day in early November 2005, Schoenberg was in meetings most of the day.  He came back to his office around 6 p.m., and could not access his email account.  Poston then appeared at his door, and asked him to come into a conference room where an HR representative was waiting.  Poston told Schoenberg that he was being terminated because, according to Schoenberg, Fifth Third and Schoenberg "were not a good cultural fit."  (Schoenberg Deposition pp. 208-212.)  Schoenberg did not understand what

Poston meant by this.  Poston denied using those words, and testified he told Schoenberg that the relationship was not going to work long-term, and that it was in "the best interest of the department" to terminate Schoenberg's employment.  (Poston Deposition p. 94)

Schoenberg filed a claim with the EEOC alleging his termination was based on religious and/or age discrimination.  After receiving a right to sue notice, he filed his complaint.

**DISCUSSION**

1.  <u>Summary Judgment Standards</u>.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253 (1968)).  The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992); <u>InterRoyal Corp. v. Sponseller</u>, 889

F.2d 108, 111 (6th Cir. 1989), <u>cert. den.</u>, <u>Superior Roll Forming</u>
<u>Co. v. InterRoyal Corp.</u>, 494 U.S. 1091 (1990). Rather, the
burden is on the non-moving party to "present affirmative
evidence to defeat a properly supported motion for summary
judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-
80 (6th Cir. 1989), and to designate specific facts in dispute.
<u>Anderson</u>, 477 U.S. at 250. The non-moving party "must do more
than simply show that there is some metaphysical doubt as to the
material facts." <u>Matsushita Electric Industries Co. v. Zenith</u>
<u>Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court construes the
evidence presented in the light most favorable to the non-movant
and draws all justifiable inferences in the non-movant's favor.
<u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and
determine the truth of the matter, but to determine whether there
is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The
court must assess "whether there is the need for trial — whether,
in other words, there are any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." <u>Id</u>. at
250. "If the evidence is merely colorable, . . . , or is not
significantly probative, . . . , the court may grant judgment."
<u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution

since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (citations omitted).

2. <u>Promissory Estoppel</u>.

Schoenberg contends that Schaefer promised him that he would become a Senior Vice President within six to nine months of accepting the position with Fifth Third. He claims that Schaefer's promise was reinforced by Poston; Schoenberg's affidavit (filed with his opposition memorandum) states that Poston told him in September 2005 that there were no performance issues interfering with his nomination, and he could expect to be nominated in December 2005. Schoenberg admits that his only conversation with Schaefer on this subject took place before he signed the employment offer letter. That letter clearly states that all officer appointments were subject to the normal officer nomination process and required approval of the Bank's Board. More importantly, the letter plainly states that any appointment is contingent upon Schoenberg's performance.

An at-will employee may recover under a promissory estoppel claim when "(1) the employer made a representation of continued employment that could be deemed a promise; (2) the employee relied upon the promise; (3) that reliance was reasonable and foreseeable; and (4) the employee was injured as a result of his reliance." Kelly v. Georgia-Pacific Corp., 46 Ohio St.3d 134, 545 N.E.2d 1244, Syllabus ¶3 (1989). Whether the claim is labeled promissory estoppel or implied contract, specific representations leading to an expectation of continued employment are essential. See Wing v. Anchor Media, Ltd. Of Texas, 59 Ohio St.3d 108, 110-111, 570 N.E.2d 1095 (1991): "... a promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment-at-will." In Wing, the plaintiff had been promised a future opportunity to buy an equity position in a radio station. The Ohio Supreme Court held that promise was not equivalent to a promise of job security that might give rise to an estoppel, even though the plaintiff assumed that equity ownership meant job security.

Thus, under Ohio law, the critical issue is whether a promise of a specific term of continued employment was made. See, e.g., Craddock v. Flood Co., 2008 Ohio 112 (9th Dist. App., January 16, 2008): "An employee who asserts employment pursuant

-12-

to an implied contract bears the heavy burden of demonstrating
(1) assurances on the part of the employer that satisfactory work
performance was connected to job security; (2) a subjective
belief on the part of the employee that he could expect continued
employment; and (3) indications that the employer shared the
expectation of continued employment." (Id. at ¶7, citations
omitted) Craddock involved a claim by a long-term employee with
an unblemished record, who was told that he "could expect to be
with the company for a long time." This was insufficient to
establish a promise of continued employment. And in Sagonowski
v. Andersons, Inc., 2005 Ohio 326 (6th Dist. App., January 28,
2005), the employee's manager had described the company's culture
of "permanent" employment, and the employee had been told that
"you won't get rich at The Andersons, but you'll always have a
job." These were insufficient to support a promissory estoppel
claim of continued employment.

See also, Langlois v. W.P. Hickman Sys., 2006 Ohio 3737 (8th
Dist. App., July 20, 2006) at ¶22: "Here, Langlois cannot satisfy
even the first element of promissory estoppel because neither of
the two alleged "promises" contained a specific duration of
continued employment. The alleged "promise" that Langlois would
become chief executive officer at Hickman if he helped D'Anza
acquire control of the company did not contain a specific length
of time. Likewise, the alleged 'promise' that Langlois would

have a job as long as his health permitted or until he decided to retire is insufficient to overcome a presumption of at-will employment because it does not contain a specific length of time."

In contrast, in <u>Miller v. Lindsay-Green, Inc.</u>, 2005 Ohio 6366 (10th Dist. App., December 1, 2005), the plaintiff was recruited by the defendant to manage a car dealership. Plaintiff was reluctant to leave his job and move to another city; to entice him to do so, defendant promised him a job for ten years, with specific responsibilities outlined during that period. Plaintiff accepted the job, and then was fired after less than two years, after a confrontation with the defendant's son. The court affirmed the jury's award of promissory estoppel damages (and the trial court's denial of defendant's summary judgment on the claim) because defendant's promise was for a definite ten-year term of employment.

In this case, a promise of an appointment to a senior officer position is plainly not synonymous with a promise of a specific term of employment. Securing an officer appointment is not a guarantee of job security, or of any specific term of employment, especially in view of the express at-will provision of Schoenberg's written contract. Under Ohio law, Schoenberg's promissory estoppel claim fails. Defendants are entitled to summary judgment on this claim.

-14-

3.  <u>Breach of Contract</u>.

   Schoenberg claims that Fifth Third breached his employment contract when it failed to promote him to senior vice president. Fifth Third argues his contract contained no term guaranteeing his promotion, and in fact expressly stated that any nomination is conditional upon his acceptable performance and upon the President's and the Board's approval.

   In opposing Defendants' motion, Schoenberg suggests that he entered into an oral contract with Defendants, created by Schaefer's and Poston's promises that he would be nominated. Any prior oral promises or representations made by Schaefer or Poston are superceded by the express terms of the subsequent written employment agreement Schoenberg signed, and parol evidence may not vary those terms. A written contract may be subsequently modified orally; see, e.g., <u>Clem v. Steiner</u>, 2003 Ohio 4865 (11th Dist. App., September 12, 2003) at ¶16. But Schoenberg must establish all the requisites of a contract - an offer, acceptance, and proof of the contractual terms. Schoenberg's belated assertion in an affidavit that Poston "promised" him he would be nominated is not sufficient to establish a binding oral contract for continued employment, which would supercede his written at-will agreement.

   For these reasons, Schoenberg's claim for breach of contract fails, and Defendants are entitled to judgment on the claim.

4.  <u>Breach of Covenant of Good Faith and Fair Dealing</u>.

Fifth Third cites several cases holding that this claim is recognized in Ohio in only a few, limited situations outside of commercial contracts governed by the UCC, primarily in insurance bad faith or other quasi-fiduciary relationships.  The implied covenant is not imposed upon an at-will employment relationship. <u>Mers v. Dispatch Printing</u>, 19 Ohio St.3d 100, 105 (1985); <u>Borowski v. State Chem. Mfg. Co.</u>, 97 Ohio App. 3d 635, 645 (8th Dist. App. 1994): "Ohio does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in the case of a wrongful discharge of an at-will employee[,]" citing <u>Mers</u>.  And see, <u>Edelman v. Franklin Iron & Metal Corp.</u>, 87 Ohio App. 3d 406, 410 (2nd Dist. App. 1993): "Ohio law does not recognize the doctrine of good faith and fair dealing in employment contracts."

Schoenberg does not respond to Defendants' argument.  The Court concludes that the majority of Ohio cases clearly hold that an at-will employee may not sue in tort for a breach of the covenant of good faith and fair dealing.  The Court therefore grants summary judgment to Defendants on this claim.

5.  <u>Religious and Age Discrimination</u>.

Schoenberg is Jewish and was born in 1963.  He was 41 when he joined Fifth Third.  He contends that Fifth Third fired him because of his religion, and retained younger Christian

employees, violating Title VII and the ADEA (as well as analogous Ohio statutes). Fifth Third seeks judgment on both of Schoenberg's discrimination claims. It argues he cannot establish a prima facie case of either religious or age discrimination, and that he has no evidence that Fifth Third's legitimate reason for terminating Schoenberg is a mere pretext for illegal discrimination. The federal and state law claims are analyzed under the same standards, and will be considered together. See Little Forest Med. Ctr. Of Akron v. Ohio Civ. Rights Comm., 61 Ohio St. 3d 607, 609, 575 N.E.2d 1164 (Ohio 1991).

Schoenberg initially admitted that he had no direct evidence of discrimination. However, in opposing Defendants' motion, Schoenberg suggests that his direct evidence of discrimination is Joyner's testimony that one reason Schoenberg was terminated was to keep Lance Murray from resigning. (Joyner Deposition at p. 55). Murray is under 40 and a Christian.

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." Rowan v. Lockheed Martin Energy Systems, 360 F.3d 544, 548 (6th Cir. 2004). In this context, direct evidence is evidence which if believed by the trier of fact, leads directly to the conclusion that religious or age discrimination was a motivating factor in Schoenberg's termination. For instance, in Ezell v. Potter, 400 F.3d 1041

-17-

(7th Cir. 2005), the Seventh Circuit held that a supervisor's statement that he and a co-supervisor had a plan to get rid of older workers and replace them with younger, faster workers was direct evidence of discriminatory intent, and was sufficient to allow plaintiff to take his case to trial. <u>Ezell</u> in turn relied on <u>Wichmann v. Board of Trustees of S. Illinois Univ.</u>, 180 F.3d 791, 801 (7th Cir. 1999), where the court characterized as direct evidence a supervisor's statement in response to a question about why the plaintiff had been terminated:  "Think of it like this. In a forest you have to cut down the old, big tress so the little trees underneath can grow."

In <u>Scott v. Postmaster General</u>, 182 Fed. Appx. 521 (6th Cir. 2006) (unpublished), the Sixth Circuit rejected plaintiff's alleged direct evidence, a remark made by his supervisor: "Why don't you retire and make everybody happy."  The Court held this was not direct evidence of discrimination, because "retire" does not necessarily refer to "age" or anything directly related to age.  Several inferences would be necessary to connect the statement to discriminatory animus.  The Court also noted that "only the most blatant remarks, whose intent could be nothing other than to discriminate..." will amount to direct evidence. <u>Id</u>. at 526 (internal citations omitted).

Here, Joyner's statement that one of the reasons Schoenberg was terminated was "to keep" Lance Murray, is not direct evidence

of age discrimination.[1]  Poston and Joyner testified that Murray

was a valued employee, considered to be a rising star by many

people at the bank (including his former supervisor).  Nothing

that Murray said about Schoenberg even remotely concerned his age

or his religion.  The fact that Murray's difficulties with

Schoenberg's management factored into the decision to terminate

is not direct evidence that his termination was based on either

his age or his religion.

    In the absence of direct evidence of discrimination,

Schoenberg argues he satisfies the familiar McDonnell-Douglas

rubric for analyzing discrimination claims.  To establish his

prima facie case, Schoenberg must show that he is a member of a

protected class, he suffered an adverse employment action, he was

qualified for his job, and he was replaced by someone outside of

his protected class, or that he was treated differently than

similarly situated employees.  Tepper v. Potter, 505 F.3d 508,

515 (6th Cir. 2007).[2]  The parties do not dispute the first three

of these requirements, but Fifth Third argues he has not

satisfied the fourth, that he was replaced by a non-protected

_____

    [1] Joyner did not testify that Schoenberg was fired so the
bank "could keep" Murray.  She testified the fact that Murray was
so unhappy that he told Poston he wanted to resign was, to her, a
reflection of definite performance issues with Schoenberg.
Joyner Deposition at pp. 55-56.

    [2] Contrary to Plaintiff's suggestion, Tepper involved claims
for religious discrimination **and** accommodation. The test recited
above applied to the religious discrimination claim.

employee or treated differently than similarly-situated employees.

Poston testified that he decided not to replace Schoenberg because his subordinate managers, Lance Murray and Mark Wise, could absorb Schoenberg's job duties in addition to their own. In addition, Poston was concerned about departmental morale; he believed that Schoenberg's departure was perceived as a positive development in the department, but was concerned that bringing in new leadership immediately might have adverse impacts. (Poston Deposition pp. 92-93.) Murray testified that he and Wise divided Schoenberg's duties until a decision was reached on "where we want to go with the organization... Ultimately, they made a decision that they were going to move forward without a director-level position. So I guess that became more permanent." (Murray Deposition p. 50) Neither Murray nor Wise were promoted to the IT Audit Director position that Schoenberg vacated.

The Sixth Circuit has held that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." <u>Barnes v. GenCorp, Inc.</u>, 896 F.2d 1457, 1465 (6th Cir. 1990). Schoenberg contends that his claims must be analyzed under a

reduction in force rubric.  In <u>Ercegovich v. Goodyear</u>, 154 F.3d

344 (6th Cir. 1998), the court held that the fourth prong of an

RIF discrimination claim must be altered, because a plaintiff by

definition cannot establish that he was "replaced."  In those

circumstances, the fourth prong is satisfied when plaintiff comes

forward with "additional direct, circumstantial, or statistical

evidence tending to indicate that the employer singled out the

plaintiff for discharge for impermissible reasons." <u>Id</u>. at 350

(citing <u>Barnes v. GenCorp</u>).  Schoenberg can satisfy this test by

producing additional evidence, or by showing that a similarly-

situated, non-protected person was treated more favorably.

Schoenberg suggests that the RIF analysis **lowers** his prima

facie burden.  The Court disagrees, as <u>Ercegovich</u> plainly

requires him to come forward with some evidence on the fourth

prong of the test.  Defendants contend that an RIF analysis is

irrelevant, because Schoenberg was terminated for performance

problems, not because his position was eliminated.

Whether or not an RIF analysis is proper, the Court

concludes that Schoenberg has not established his prima facie

case.  Schoenberg has not shown that any similarly-situated

employee was treated more favorably.  He argues that he was

terminated, and Murray and Wise were retained.  But Murray and

Wise were Schoenberg's subordinates, they had different job

duties, and they reported to Schoenberg.  While all three were in

the same general department, internal audit, that fact is insufficient to establish relevant similarity for purposes of a prima facie case. The **relevant** aspects of the two employees' situations must be similar. These aspects include whether the two employees (1) shared the same supervisor, (2) were subject to the same standards, and (3) engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998) (internal citation omitted).

Moreover, Schoenberg has not come forward with any additional direct, indirect, or statistical evidence tending to show that Schoenberg was "singled out" based on impermissible religious or age discrimination. He admits that no one made any ageist or discriminatory comments to or about him while he worked at the bank. He presents no statistics suggesting that Jewish people or non-Christians, or those over 40, were singled out more often for termination or other adverse employment actions.

Schoenberg cites several incidents he claims are sufficient to suggest discrimination. When he began work at the bank, it was during the December 2004 holiday season. Schoenberg saw a Christmas tree on the department floor. He asked Poston if there was something that "we could put out" like a Star of David or a Menorah. Poston looked puzzled, and said no.

Schoenberg described some informal conversations that would happen at the end of the work week, when Poston and others would talk about their families or plans for the weekend. During these discussions there were references to parishes, or to schools that other employees' children attended. Schoenberg said he "felt awkward" in these conversations. He admitted that no one had ever criticized him, or left him out of conversation because he was Jewish. He never heard any comments that suggested any anti-Semitic bias or prejudice. He described another employee, who was a devout Christian and wore a cross on his lapel. Schoenberg said that this employee was "ridiculed" by other managers, who called him a "Bible thumper" or commented on the number of children he had. Schoenberg does not claim that any such comments were made directly to that employee, and Schoenberg never complained to anyone that the comments he overheard made **him** feel uncomfortable. Schoenberg also said that the employee in question asked Schoenberg one day about his own religion; when Schoenberg told him he was Jewish, the employee's reaction was positive.

These incidents, individually and collectively, are not the type of additional direct or indirect evidence required by Ercegovich to establish a prima facie case. But assuming Schoenberg has carried his burden on both age and religious discrimination, he has not established that Defendants'

explanation for his termination is a pretext for illegal discrimination.  Under <u>Manzer v. Diamond Shamrock Chemicals Corp.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994), pretext may be established by evidence that (1) the proffered reasons had no basis in fact, (2) the reasons did not actually motivate his discharge, or (3) the reasons were insufficient to motivate his discharge.

Schoenberg relies on the incidents described above and offers no other evidence suggesting age or religious bias played a role in his termination.  He argues that sufficient evidence exists for the jury to disbelieve Defendant's explanation, that his performance was inadequate.  For example, he contends  that the leadership inventory is not a reliable basis upon which to make termination decisions.  Whether or not that is the case, an employer may use faulty evaluation procedures or make unwise or mistaken decisions, so long as illegal discrimination is not a factor in those decisions.  <u>Braithwaite v. Timken Co.</u>, 258 F.3d 488, 494 (6th Cir. 2001): "... we do not require that the decisional process used by the employer be optimal or that it left no stone unturned."  And see <u>Conley v. U.S. Bank National Assn.</u>, 211 Fed. Appx. 402, 409 (6th Cir. 2006) (unpublished), and cases discussed therein.

Schoenberg also complains that the Bank did not document in writing all of the complaints about him made by other employees,

and that Poston did not provide him with a mid-year written review reflecting any deficiencies in Schoenberg's performance. Poston testified that he routinely did not make notes of conversations with other employees, and that the bank's normal policy is for year-end reviews. Schoenberg also suggests that Defendants' justification for the termination was created only after he initiated litigation. This suggestion is belied by the documentation of communications between Poston and Joyner, and by the results of the leadership inventory.

To establish a genuine dispute on pretext, Schoenberg must do more than simply deny the Defendants' explanation, or attack their witnesses' credibility. In <u>Ercegovich</u>, for example, the plaintiff presented a number of specific incidents demonstrating rather widespread hostility among senior management towards older workers. In <u>White v. Columbus Metropolitan Housing Authority</u>, 429 F.3d 232 (6th Cir. 2005), the Sixth Circuit found that a female employee's discrimination claim (based on a failure to promote) failed because she had not established pretext. The plaintiff presented evidence that a CMHA manager was "determined" to hire a man; that CMHA accepted the male's application after the deadline had passed; that CMHA violated its own internal policies on internal hiring and anti-nepotism; and that CMHA neglected to do a background check on the successful candidate, which would have revealed a guilty plea to disorderly conduct.

Finally, plaintiff alleged that a member of the hiring committee told her that they wanted a "grass roots guy" for the position. The Sixth Circuit concluded that, even if all of White's allegations were true, they would not establish that CMHA's legitimate reasons were pretext:

> The most White can show, in viewing the evidence in the light most favorable to her, is that her application was not given as much attention as she would have liked. However, she has not presented sufficient evidence for this court to conclude that the true reason behind the lack of attention is the fact that she is a woman.

Id., 429 F.3d at 246. See also, <u>Macy v. Hopkins County Bd. Of Education</u>, 484 F.3d 357 (6th Cir. 2007), citing <u>White</u> and concluding that plaintiff had not established pretext by challenging the veracity of the employer's explanation, or by alleging a failure to follow normal procedures. And, in <u>Korna v. Veda, Inc.</u>, 1996 U.S. App. LEXIS 25329 (6th Cir. 1996) (unpublished), plaintiff alleged discrimination based on his religion (Muslim) and his national origin (Egyptian). The court rejected as insufficient plaintiff's pretext evidence, which consisted of his supervisor's frequent comments on his deep Christian faith; holding weekly Bible classes and prayer meetings at work; and his supervisor's comment a year before plaintiff's termination that plaintiff was not "going to work out based on his religion and where he is from." <u>Id</u>. at *13. Even if true, the court found this statement was too isolated, and therefore

was insufficient to defeat summary judgment.

Here, Schoenberg's evidence is far less.  Poston's negative response to the request to put a Menorah next to the Christmas tree, almost one year before the termination, is too isolated and too ambiguous to constitute evidence of discriminatory animus sufficient to overcome summary judgment.

The Court therefore grants Defendants' motion with respect to Schoenberg's federal and state claims of age and religious discrimination.

## CONCLUSION

For all the foregoing reasons, the Court grants Defendants' motion for summary judgment.  (Doc. 35)  Plaintiff's claims are hereby dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: October 28, 2008          s/Sandra S. Beckwith
                                 Sandra S. Beckwith, Chief Judge
                                 United States District Court